UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON VELARDE, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNION CITY POLICE DEPARTMENT, et al.,<br><br>    Defendants. | Case No. 13-cv-04011-JD<br><br>**ORDER RE SUMMARY JUDGMENT**<br>Re: Dkt. No. 33 |

This is a civil rights action arising out of a September 5, 2009 encounter between plaintiffs Aaron, Devin, Arthur and Heide Velarde, and members of the Union City Police Department. Plaintiffs allege that excessive force was used against them in an incident in front of their home. They originally brought a barrage of claims against defendants under a number of theories and statutes. The Court dismissed the seventh through tenth claims of the complaint, and claims for false arrest brought by Arthur, Devin, and Aaron Velarde, on October 1, 2015. Dkt. No. 39. Claims against the Union City Manager, the Union City Police Department, and twelve of its members were also dismissed. *Id*. The remaining claims allege violations of Fourth and Fourteenth Amendment rights and failure to adequately supervise and train officers under 42 U.S.C. § 1983 (claims 1 and 2), Assault and Battery (claim 3), Negligence (claim 4), False Arrest (claim 5, as to Heide Velarde only), and violation of the California Bane Act, Cal. Civ. Code § 52.1 (claim 6), by means of excessive force (all plaintiffs) or unlawful arrest (Heide Velarde only).

The City of Union City and five members of the Union City Police Department are the current defendants. *Id*. They move for summary judgment under Federal Rule of Civil Procedure 56 on Arthur Velarde's excessive force claims, the Fourteenth Amendment excessive force claims, the City of Union City's liability as a public entity, and plaintiffs' California Bane Act claims

based on excessive force. The Court grants and denies the motion in part.

Defendants have not sought summary judgment on Aaron, Devin or Heide Velarde's Fourth Amendment excessive force claims, the assault and battery claims, the negligence claims against defendant officers, Heide Velarde's claim of false arrest, or her related California Bane Act claim. These claims will proceed to trial.

**BACKGROUND**

The parties do not meaningfully dispute the material facts. On September 5, 2009, Union City Police Department Officers Michael Mahaney and Andrew Gannam, in separate police cars, followed Aaron and Devin Velarde as they parked their car in front of the Velarde family home. Dkt. No. 44 at 2-3. The officers stopped as well, and an altercation began between the officers and Aaron and Devin[1] after they stepped out of their car. *Id*. at 3.

Officer Mahaney was in the middle of handcuffing Devin when Devin's father, Arthur Velarde, came out of the house. *Id*. Arthur had seen the "flashing lights," "heard noises outside of his house," and "saw police vehicles, the police officers, and his son, Devin." *Id*. As he came out the front door, Arthur saw Devin "on the sidewalk" being cuffed by police, about "10 or 15 feet away." Dkt. No. 44-1, Exh. C at 13:7-24. Arthur "was angry and yelled at the officers, 'What's going on?', asking questions, but did not hear" any response. Dkt. No. 44 at 3; Dkt 44-1, Exh. C at 14:21-15:16. Arthur "ran" from the house, toward Mahaney and Devin. Dkt. No. 44 at 8 (citing Dkt. No. 44-1, Exh. C at 12:7-17, 13:8-10, 15:15); Dkt. No. 44 at 4. Arthur stepped off the porch into the yard and "asked the officer again" what was going on. Dkt. No. 44-1, Exh. C at 16:23-17:1. At this point the officer was "still kind of far away but could have been about ten feet, five feet, or something like that" away from him. Dkt. No. 44-1, Exh. C at 17:10-16. Arthur spoke directly to Devin, asking "What did you do?" and Devin said he had not done anything. Dkt. No. 44 at 4 (stating this happened after Arthur "moved several feet closer" to the officers); *id*. at 8 (stating this happened "[a]s Arthur got closer" to the officer and Devin); *see also* Dkt. No. 44-1, Exh. C at 16:16-19 (testifying this happened before Arthur left the porch). Arthur kept

---

[1] All four plaintiffs share the same last name. To avoid confusion, the Court will follow the plaintiffs' practice of referring to themselves by first names. *See, e.g.*, Dkt. No. 44 at 2 n.3.

2

1   approaching the officer, and was "[n]o more than three feet" away when he heard the officer tell
2   him to get back. Dkt. No. 44-1, Exh. C at 17:17-20, 18:1-5. Arthur saw that the officer had his
3   taser drawn. *Id*. at 17:21-23. Arthur then turned around and was "halfway to my steps" or "about
4   three to five feet away" when he "slightly turn[ed] around -- 'cause I want to check on my son"
5   and was shot with the taser in his chest. *Id*. at 17:23-25; Dkt. No. 44 at 4. He says "[m]aybe three
6   seconds" had passed from the officer's order to get back. Dkt. No. 44-1, Exh. C at 19:9-22.

7   After the taser hit, Arthur fell to the porch step. *Id*. at 18:8-20; Dkt. No. 44 at 4. The
8   officer who tased him then "picked me up and threw me to the left side of the -- of the yard." Dkt.
9   No. 44-1, Exh. C at 21:10-24. He hit the ground either on "[m]y right side" or face first, "'cause
10  my whole face was on the ground in the dirt." *Id*. at 22:2-13; Dkt. No. 44 at 4. Plaintiffs add the
11  allegation that Mahaney "rushed Arthur and assumed a knee-hold position on his shoulder …
12  despite Arthur's compliance." Dkt. No. 44 at 4. Mahaney cuffed Arthur's left arm, but could not
13  get to the right arm because Arthur was on top of it. *Id*. Mahaney "wrench[ed] repeatedly" on
14  Arthur's shoulder, trying to get at his second arm, until Sergeant Robert Martin arrived on the
15  scene and "helped roll Arthur off of his side" and his hands were cuffed. *Id*.

16  While Officer Mahaney struggled to handcuff Arthur, and Officer Gannam was occupied
17  with Aaron and Devin, Heide Velarde came outside. *Id*. at 4-5. She was ordered back to the
18  house but came out again. *Id*. at 5. Officer James Martin (not to be confused with Sergeant
19  Robert Martin) arrived on the scene and focused on Heide. *Id*. He knocked Heide to the ground,
20  sat on her back, and handcuffed her hands. *Id*. at 5-6. Officer Baumgartner also arrived and
21  deployed his police dog Edy to bite both of Heide's legs while he attempted to arrest her. *Id*. at 6.
22  He did not issue a warning before releasing the dog. *Id*.

23  All four plaintiffs were prosecuted for their conduct in the incident. Dkt. No. 33 at 3.
24  Aaron pled no-contest to a DUI charge. *Id*. Devin and Arthur pled no contest to misdemeanor
25  charges under Cal. Penal Code § 148(a)(1), which provides penalties for "[e]very person who
26  willfully resists, delays, or obstructs any … peace officer … in the discharge or attempt to
27  discharge any duty of his or her office or employment." *See id*.; Cal. Penal Code § 148(a)(1); Dkt.
28

No. 44-1 at ¶ 7, Exh. F; Dkt. 34 at ¶¶ 2-4, Exhs. B-D.[2] Because Devin and Arthur pleaded no contest to misdemeanors, their attorneys successfully argued they should not have to stipulate to underlying facts in their plea bargain or sentencing. Dkt. No. 44-1, Ex. F at 20-23. But plaintiffs acknowledge that Arthur violated Section 148(a)(1) "at the time he first appeared on the scene and immediately began delaying and obstructing officers from arresting Devin and Aaron," even before he stepped off the porch and advanced within three feet of Officer Mahaney. Dkt. 44 at 8.

Defendants proffer a number of facts about the Union City Police Department's policies, including officer hiring, training, certification, monitoring, and internal affairs policies and records. Dkt. No. 33 at 4-8; Dkt. No. 36. The department's use of force, taser, and police dog policies in effect as of September 5, 2009 are the main policies applicable here. *See* Dkt. No. 44 at 12. The "Use of Force" policy (policy 300, dated 3/29/2009) states that an officer "is expected to use only that degree of force reasonable under the circumstances." Dkt. No. 43-6, Exh. C at UC000154. Under the policy, tasers were classified "[n]on-deadly force applications." *Id*. The specific "Conducted Energy Device (CED)," or taser, policy (policy 309, dated 3/29/2009) states that tasers are available to "[p]ersonnel who have successfully completed and [sic] approved departmental training course." Dkt. No. 43-5, Exh. G at 47. The policy requires that "a verbal announcement of the intended use of the CED shall precede the application" "[u]nless it would otherwise endanger officer safety or is impractical due to circumstances." *Id*. at 45. After a verbal warning, if circumstances permit, the policy states that an officer "may, but is not required to display the electrical arc … or laser … to gain compliance." *Id*.

The "Canine Program" policy (policy 318, dated 3/29/2009) states that "each canine team shall be trained and certified to meet current POST standards" and "be recertified to current POST standards … on an annual basis." Dkt. No. 43-5, Exh. J at 81. According to the policy, "a clearly audible warning to announce that a canine will be released … shall be made prior to releasing a

---

[2] Defendants filed a request for judicial notice of the criminal complaint and minutes from Aaron, Devin, and Arthur's incident-related criminal prosecutions. Because the court may review public records and proceedings from other courts that are relevant to the issues at hand, and because the plaintiffs did not oppose the request, the Court takes judicial notice of these records. *Bias v. Moynihan*, 508 F.3d 1212, 1224-25 (9th Cir. 2007).

1  canine," including in the case of an apprehension, unless "it would otherwise increase the risk of injury or escape." *Id*. at 78.

## DISCUSSION

Defendants seek summary judgment under Rule 56 of the Federal Rules of Civil Procedure on some but not all of the claims in the complaint. Dkt. No. 33 at 1. Under Rule 56, a "party may move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under the well-established case law governing summary judgment motions, a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict" for either party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome of the suit under the governing law. *Id*. at 248-49. To determine whether a genuine dispute as to any material fact exists, a court must view the evidence in the light most favorable to the non-moving party and draw "all justifiable inferences" in that party's favor. *Id*. at 255. A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The moving party must initially establish the absence of a genuine issue of material fact, which it can do by "'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. It is then the nonmoving party's burden to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *Id*. at 324. "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer, Inc*., 198 F.3d 1130, 1134 (9th Cir. 2000). Only genuine disputes -- where the evidence is such that a reasonable jury could return a verdict for the nonmoving party -- "over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

In determining whether to grant or deny summary judgment, it is not the Court's task "to

scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quotation omitted). Rather, it is entitled to rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment." *Id*. (quotation omitted).

## I. THE 14TH AMENDMENT EXCESSIVE FORCE CLAIMS

In opposition to the summary judgment motion, plaintiffs stipulate to striking language in the complaint that purports to assert claims under the 14th Amendment. Dkt. No. 44 at 1. The Court accepts the stipulation and strikes these claims from the complaint.

## II. ARTHUR VELARDE'S CLAIMS OF EXCESSIVE FORCE

Plaintiffs also stipulate to dismissing claims of excessive force based on the tasing of Arthur Velarde against Officer Gannam, Officer Martin, and Officer Baumgartner. Dkt. No. 44 at 1. The Court accepts this stipulation, too. Since plaintiffs have not alleged any interaction between these officers and Arthur Velarde during the incident, the Court dismisses Arthur Velarde's excessive force claims against these officers in their entirety.

For plaintiffs' claims against Officer Mahaney and Sergeant Martin, defendants contend that qualified immunity applies to the use of a taser against Arthur Velarde. Defendants also argue that Arthur's excessive force claims should be dismissed as to Sergeant Martin because he was not an integral participant.[3]

"Qualified immunity balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). An officer is entitled to qualified immunity unless the facts viewed most favorably to the plaintiff show that (1) the officer violated a constitutional right; and (2) that right was clearly established at the time of the alleged misconduct. *Id.* at 232 (citing

---

[3] As an alternative ground, defendants argue that Arthur's excessive force claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Dkt. No. 33 at 12. Defendants do not say whether they mean to argue that this alleged bar extinguishes all of Arthur's excessive force claims or just the claims based on taser use. In light of the Court's finding of qualified immunity for the use of the taser and the unclear state of the briefing, the Court declines to decide the *Heck* question.

*Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (officers entitled to qualified immunity when facts viewed in the light most favorable to plaintiff show officers did not violate a constitutional right, or if they did, the scope of that right was not clearly established in the context of the case). Under *Pearson*, the two prongs of the analysis may be analyzed in either order. 555 U.S. at 242.

Because the events in the complaint occurred in 2009, the parties generally agree that qualified immunity should be determined under case law preceding the Ninth Circuit decision in *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010). *See* Dkt. No. 33 at 14; Dkt. No. 44 at 9. Before *Bryan*, no controlling authority in this circuit had held that tasers in dart mode constituted an intermediate level of force. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093-94 (9th Cir. 2013). A "reasonable officer … could have made a reasonable mistake of law regarding the constitutionality of the taser use in the circumstances" of the case. *Bryan,* 630 F.3d at 833. Accordingly, the Ninth Circuit granted qualified immunity for an officer's taser use against an unthreatening, unarmed plaintiff stopped for driving without a seatbelt, even though he "did not verbally threaten" or confront the officer, was not trying to flee, and "was twenty feet away" and "not even facing" the officer when shot. *Id*. at 822, 827, 832-33. Although the court found Bryan's resistance minimal -- at most had failed to comply with an order to "remain in his car" -- qualified immunity applied because it was not clearly established at that time that taser use should be viewed as an intermediate application of force. *Id*. at 830, 833.

Plaintiffs do not dispute this law but try to argue around it by contending that Arthur offered nothing but "mere passive resistance" and so the officers had no justification for applying any force at all. *See* Dkt. No. 44 at 9-10 (analogizing to *Gravelet-Blondin*, 728 F.3d at 1086). This argument fails under plaintiffs' own version of the facts. Plaintiffs admit (in connection with an argument on a different issue) that Arthur began violating California Penal Code § 148(a)(1) as soon as "he first appeared on the scene and immediately began delaying and obstructing officers … with his questions." Dkt. No. 44 at 8. Arthur later pled no contest and was convicted under Section 148(a)(1). Dkt. No. 33 at 3; Dkt. No. 44-1 at ¶ 7, Exh. F; Dkt. No. 34 at ¶ 4, Exh. D. He has also dropped any claims for false arrest. Dkt. No. 39. Consequently, plaintiffs cannot show

that officers had no justification for the application of any quantum of force against Arthur, because "[t]he Fourth Amendment does not prohibit a police officer's use of reasonable force during an arrest." *See Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1095 (9th Cir. 2006) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

But even if plaintiffs had not conceded that Arthur had already broken the law the moment he appeared on the scene, his behavior cannot be compared to the plaintiff in *Gravelet-Blondin*, where the tasering was not entitled to qualified immunity. Blondin was a "perfectly passive" bystander, standing thirty-seven feet away and on the other side of a car from a police action, making no threatening gestures, and posing no immediate threat to anyone's safety when a police officer rushed at him and tased him. *Gravelet-Blondin*, 728 F.3d at 1090-92. Plaintiffs' own version of the facts establishes that Arthur was not "perfectly passive" or so far away from the action that he could not be reasonably viewed as a threat to officers' safety. To the contrary, plaintiffs concede that Arthur was "angry and yelled at the officers," that he "ran" out of his house and "immediately began delaying and obstructing officers from arresting Devin and Aaron" the moment "he first appeared on the scene." Dkt. No. 44 at 8-9. Arthur advanced to within three feet of the officer, before acknowledging that the officer had a taser drawn and was ordering him back. Dkt. No. 44-1, Exh. C at 17:13-18:4. Arthur concedes that he did not fully comply with the officer's order to retreat and that he was only "halfway to my steps" or "three to five feet away" when he "slightly turn[ed] around" and was shot with the taser in his chest. *Id*. at 17:23-25; Dkt. No. 44 at 4. Given that Officer Mahaney was still trying to handcuff Devin at this time, a reasonable officer could have viewed Arthur's aggressive entry on the scene and failure to follow the officers' orders as a credible threat, and indeed a greater threat than presented by the plaintiff in *Bryan*. *See* 630 F.3d at 832-33; *see also Gravelet-Blondin*, 728 F.3d at 1094 (explaining qualified immunity available for pre-*Bryan* taser use where plaintiffs "either took an affirmative step to contravene officer orders or engaged in behavior that posed some threat to officer safety," even if that behavior was "'passive' or 'minor' resistance, rather than 'truly active resistance'"). In these circumstances, even when viewed most favorably for plaintiffs, qualified immunity lies for use of the taser on Arthur.

8

The excessive force claims against Sergeant Martin are dismissed. Plaintiffs have provided no evidence of Sergeant Martin's involvement in the tasing or even his presence on the scene at that time. *See Lolli v. Cnty. of Orange*, 351 F.3d 410, 418 (9th Cir. 2003) (dismissing claims against supervisory officers who were not present and had no demonstrated involvement in the incidents). Merely arriving as a supervisor after the tasing was already over or helping to cuff the plaintiff afterwards does not amount to "integral participation" in something that had already occurred. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) ("An officer's liability under section 1983 is predicated on his 'integral participation' in the alleged violation," which "does require some fundamental involvement in the conduct that allegedly *caused* the violation" (emphasis added)). While Arthur says that Sergeant Martin "used physical force" against him, he points only to the fact that the Sergeant "helped roll Arthur off of his side" and helped to handcuff him. Dkt. No. 44 at 11. Plaintiff provides no support for the apparent contention that this purported "force" was unreasonable under the circumstances of effecting the arrest. Plaintiffs also fail to allege or show that Sergeant Martin was the source of any order or policy that caused any excessive force against Arthur.

### III.   CLAIMS AGAINST THE CITY OF UNION CITY

While a municipality is a "person" for Section 1983 purposes under the landmark holding in *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690-91 (1978), it cannot be held liable solely because it employed a tortfeasor. Rather, a municipality may only be held liable "when execution of a government's policy or custom . . . inflicts the injury." *Los Angeles County, Cal. v. Humphries*, 562 U.S. 29, 36 (2010) (internal quotation marks and emphasis omitted). Plaintiffs basically concede that their excessive force claims against the city fail because Section 1983 does not permit vicarious liability for municipalities. *See* Dkt. No. 44 at 1-2; *see* Dkt. No. 33 at 10. They also agree that Union City is not directly liable for common law torts including negligence. Dkt. No. 44 at 2. These claims against Union City are dismissed.

Plaintiffs maintain that the City of Union City is liable under Section 1983 because the Union City Police Department's taser, use of force, and canine policies are inadequate and caused

constitutional violations against the plaintiffs.[4]  Dkt. No. 44 at 12.  For that claim, Plaintiffs must show: "(1) that Plaintiffs were deprived of a constitutional right; (2) that the City had a policy; (3) that the policy is deliberately indifferent to the Plaintiffs' constitutional right; and (4) that the policy was the moving force behind the constitutional violation."  *Snyder v. City & Cnty. of San Francisco*, 288 F. App'x 346, 348 (9th Cir. 2008).  The policy "'need only cause [the] constitutional violation; it need not be unconstitutional per se.'"  *Brown v. Cnty. of Kern*, No. 1:06-CV-00121OWW-TAG, 2008 WL 544565, at *15 (E.D. Cal. Feb. 26, 2008) (quoting *Jackson v. Gates*, 975 F.2d 648, 654 (9th Cir.1992)).  It is not enough to show "'but-for'" cause, "'the policy must be the proximate cause of the section 1983 injury.'"  *Snyder*, 288 F. App'x at 348 (quoting *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996)).

Plaintiffs have not proffered enough evidence to keep this claim alive past summary judgment.  They have not adduced evidence showing that Union City's policies manifest "deliberate indifference" to constitutional rights.  Plaintiffs' main attack on the taser and canine policies is that they permit too much officer discretion.  Dkt. No. 44 at 12-14.  They fault the taser policy for having "vaguely worded" exceptions to the warning based on "officer safety" or when "impractical."  *Id*. at 13.  They complain that the canine policy "does not specify the conditions" when a "clear audible warning" is required during an arrest.  *Id*. at 14.  But these provisions are perfectly in step with the law of this circuit, which requires only that warnings be given when "feasible" where less than deadly force is employed.  *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1235 (9th Cir. 2013) ("'We do not hold, however, that warnings are required whenever less than deadly force is employed. Rather, we simply determine that such warnings should be given, when

---

[4] Defendants detailed the Union City Police Department policies, including hiring, training, certification, monitoring, and internal affairs policies and records.  Dkt. No. 33 at 4-8; Dkt. No. 36.  In their opposition, Plaintiffs did not dispute or address the majority of this information.  *See* Dkt. No. 44 at 12.  Plaintiffs appear to have conceded that defendants have "addressed … part of plaintiffs' *Monell* claim."  *Id*.  Plaintiffs do not dispute defendants' arguments that plaintiffs' "claims against the City are barred" because the Union City Police Department's training program met or exceeded standards, because the officers were certified according to standards, and the city had certain discipline, complaint reception and investigation policies, incident documentation requirements, and because there were no prior allegations of force against the five defendant officers.  *Id*.  As plaintiffs have disputed none of these issues, the Court understands they are conceding any claims based on these facts or theories.

feasible, if the use of force may result in serious injury'") (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1283-84 (9th Cir 2001)).

Plaintiffs also fail to adduce evidence that the City's policies were the "moving force" behind any constitutional torts to Arthur (based on the use of force and taser policy) or Heide (based on the use of force and canine policy). Even assuming purely for discussion here that those torts happened, plaintiffs have not shown or even suggested how more determinative warning policies might have affected or changed the outcome in either situation. Plaintiffs' expert reports fail entirely to establish that the policies could have been a "moving force" for any alleged constitutional injuries. *See* Dkt. No. 44 at 13-14. One of the experts actually undercuts the plaintiffs' arguments, by opining that the relevant Union City Police Department policies did require warnings under the circumstances of this case. Dkt. No. 44-1, Exh. H at 5 ("Officer Mahaney should have given a verbal warning … A verbal warning prior to using the Taser is a Union City Police policy requirement …. Officer Baumgartner failed to warn… UCPD policy requires verbal warnings prior to releasing a K-9"). The other expert does not mention the policies at all. *See* Dkt. No. 44-2, Exh. B (noting that "there was no valid reason or excuse for not giving a warning" but not mentioning or explaining any connection to the UCPD canine policy). Because it appears that plaintiffs' claim really is that the officers failed to follow or abide by the City's policies, the *Monell* claims against Union City are dismissed.

IV.   **CALIFORNIA CIVIL CODE § 52.1 CLAIMS**

Aaron, Devin and Arthur Velarde allege claims under the California Bane Act, which proscribes interference with the "exercise or enjoyment" of constitutional rights through "threat, intimidation, or coercion." *See* Cal. Civ. Code § 52.1(a). Plaintiffs suggest that a violation of Section 52.1 can be established where "the quantum of force applied establishes spite." Dkt. No. 44 at 14 (citing *Davis v. City of San Jose*, 69 F. Supp. 3d 1001, 1008 (N.D. Cal. 2014)). But as defendants note, recent California case law has clarified that Section 52.1 claims may not be based on force applied incident to an arrest. Dkt. No. 33 at 22-24; *see Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 69 (2015) (coercion and force inherent in a wrongful arrest not sufficient for Bane Act claim); *Harrington-Wisely v. State*, No. B248565, 2015 WL 1915483, at *7-8 (Cal. Ct.

1  App. Apr. 28, 2015) (same).[5] *Allen* and *Harrington-Wisely* persuasively show that developments have outpaced the Section 52.1 discussion in *Davis*. *See Harrington-Wisely*, 2015 WL 1915483, at *8 n.7 (listing *Davis* among cases subject to re-assessment in light of recent state Bane Act decisions). And Aaron, Devin, and Arthur have dropped claims of false arrest and no longer contend their arrests were unlawful. Dkt. No. 39. When the arrest is lawful, "there must be evidence of a separate act of violence, threats of violence or coercion along with the constitutional violation to constitute a Bane Act claim." *Muhammad v. Garrett*, 66 F. Supp. 3d 1287, 1296 (E.D. Cal. 2014). Because Aaron, Devin and Arthur do not allege separate acts of violence, threats or coercion beyond their excessive force claims, their Bane Act claims fail.

## CONCLUSION

The Court dismisses: (1) Arthur Velarde's § 1983 claims against Sergeant Martin and Officers Gannam, Martin, and Baumgartner, and grants qualified immunity to all officers based on the use of the taser against Arthur Velarde; (2) all claims against the City of Union City; and (3) Arthur, Aaron and Devin Velarde's claims under California Civil Code § 52.1.

The parties are directed to file revised pretrial submissions reflecting this summary judgment order and in conformance with the Court's Standing Order for Civil Trials, no later than November 16, 2015. Please do not incorporate prior filings by reference or refer to previously filed materials. The Court continues the November 18, 2015 pre-trial conference to November 24, 2015 at 3 p.m. Trial remains scheduled for December 7, 2015.

**IT IS SO ORDERED.**

Dated: November 9, 2015

_____
JAMES DONATO
United States District Judge

---

[5] Federal courts may consider unpublished California state court decisions. *See Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value," citing *Nunez v. City of San Diego*, 114 F.3d 935, 943 n.4 (9th Cir. 1997)).